UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| KLICKITAT COUNTY PUBLIC UTILITY DISTRICT NO. 1, a Washington Municipal Corporation, | ) ) ) ) | NO.  CY-03-3175-LRS |
| Plaintiff, | ) ) | |
| v. | ) | ORDER GRANTING DEFENDANTS' |
| STEWART & STEVENSON SERVICES, INC., a Texas corporation; STEWART & STEVENSON POWER, INC., a Delaware Corporation; SIERRA DETROIT DIESEL ALLISON, INC., a Nevada Corporation; PAMCO INTERNATIONAL, INC., a Delaware Corporation; and WAUKESHA ENGINE DRESSER, INC., a Wisconsin corporation, | ) ) ) ) ) ) ) ) ) ) ) ) | SUMMARY JUDGMENT MOTIONS IN PART and DENYING IN PART |
| Defendants. | ) ) | |

BEFORE THE COURT is Defendants STEWART & STEVENSON SERVICES, INC., STEWART & STEVENSON POWER, INC., SIERRA DETROIT DIESEL ALLISON, INC., and PAMCO INTERNATIONAL, INC.'s ("S&S" or "Defendants") Motion for Partial Summary Judgment Re: Contract-Based Claims (Ct. Rec. 99), filed July 13, 2005; and Defendants' Motion for Partial Summary Judgment Re: Non-Contract Claims (Ct. Rec. 102) also filed July 13, 2005.  The motions were heard with oral argument in Yakima, Washington on November 15, 2005. Defendants were represented by Douglas Oles; Plaintiff Klickitat County Public Utility District No. 1's ("KPUD" or "Plaintiff") was represented

ORDER - 1

1   by Jan Essenberg.   The stayed Defendant Waukesha Engine Dresser, Inc.

2   [Dresser] was present telephonically, but did not participate in the

3   hearing.   At the close of the hearing on November 15, 2005, the Court,

4   at the parties' request,  permitted supplemental briefing for issues

5   purportedly not covered in earlier briefing but raised at oral argument.

6   On December 14, 2005, the Court issued a briefing schedule (Ct. Rec. 140)

7   granting the parties' request to exceed page limitation and clarifying

8   its supplemental briefing directive.   The parties completed and filed

9   supplemental briefing on January 17, 2006, in accordance with the Court's

10  directive.   The Court then took the pending motions under advisement.

11  **I. BACKGROUND**

12      On August 26, 2004 the Court issued an order, finding a valid

13  agreement to arbitrate existed between KPUD and Dresser under Washington

14  law and terms of the Federal Arbitration Act.   In finding an enforceable

15  agreement to arbitrate and a breach of that agreement, the Court stayed

16  the judicial proceedings against Dresser pursuant to 9 U.S.C. § 3.

17      On October 18, 2004 the Court denied without prejudice Defendant

18  S&S's Motion to Dismiss and Alternative Motion to Compel Arbitration and

19  Stay Proceedings (Ct. Rec. 72). Trial in this case is currently set for

20  October 30, 2006.

21  **II. SUMMARY OF RELEVANT FACTS**

22      A.  **<u>The Parties</u>**

23      KPUD is a Washington public utility that generates and sells

24  electric power for customers in Klickitat County.   It owns and

25  operates a power station located at the Roosevelt Regional Landfill in

26  Klickitat County.

27      KPUD's Complaint is directed towards several corporations or

28  entities allegedly affiliated with each other.   The named and

ORDER - 2

1   answering non-stayed Defendants are:  Defendant Stewart & Stevenson

2   Services, Inc.; Defendant PAMCO International, Inc.; Defendant Sierra

3   Detroit Diesel Allison, Inc.; and Defendant Stewart & Stevenson

4   Services, Inc.

5       Unless otherwise specified, the Court has referred to the

6   Defendants in a collective manner with the phrase "S&S" based on the

7   parties use of the same in their briefs.  Defense counsel, pursuant to

8   the instant motions before the court, requests the court to dismiss

9   claims against those Defendants that KPUD fails to offer evidence

10  demonstrating their individual involvement, i.e., wrongful acts or

11  omissions.

12      More specifically, Defendants state that neither Defendant

13  Stewart & Stevenson Services, Inc. nor Defendant PAMCO International,

14  Inc. sold any equipment to NEPCO for the Roosevelt Project.  KPUD

15  offers a vague statement from declarant Darby Hanson (Ct. Rec. 124)

16  that KPUD was assured by Jim Crouse that Defendant Stewart & Stevenson

17  Power, Inc. and PAMCO International, Inc. "would stand behind the

18  performance of the engines and the landfill gas treatment system."  In

19  another declaration (Ct. Rec. 123) cited by KPUD, declarant Thomas

20  Svendsen states that S&S provided a number of pieces of Sales

21  Literature about their products and services.  Mr. Svendsen does not

22  mention which specific S&S entity made specific representations to

23  KPUD.

24      S&S argues that KPUD is improperly attempting to impose liability

25  on other S&S companies in connection with the sale of equipment.  S&S

26  argues that the equipment was sold by Sierra Power Products alone and

27  that only Sierra Power Products signed the PO #101 Contract.  The

28

ORDER - 3

Court notes that Defendant Sierra Power Products is not a named
defendant, although its name is similar to named Defendant Sierra
Detroit Diesel Allison, Inc.  S&S requests the Court to dismiss the
claims against Defendants Stewart & Stevenson Services, Inc. and
Defendant PAMCO International, Inc.

The Court refrains from dismissal of claims against these
entities as requested because "Sierra Power Products," who is the real
party in interest according to S&S, is not a named defendant.  The
Court notes that Defendant Stewart & Stevenson Power, Inc. signed the
PO #101 Contract, not Sierra Power Products.  Counsel for the parties
are invited to further clarify this discrepancy through additional
papers filed with the Court.

B.  <u>The Roosevelt Facility</u>

In the mid-1990s, KPUD decided to create a power station at the
Roosevelt Regional Landfill in Klickitat County that would produce
electricity from generators run by engines burning the methane created
by the landfill.  Complaint ¶10.  KPUD solicited proposals in 1998 for
the creation of such a facility that would utilize reciprocating
piston engines.  Id. at ¶12.  On June 15, 1998, Defendant Stewart &
Stevenson Power, Inc. ("SSPI") entered into a Natural Gas/Land Fill
Fueled Reciprocating Engine Power Plants Partnering Term Sheet ("June
1998 Partnering Term Sheet") with National Energy Production Company
("NEPCO"), a former subsidiary of the now-defunct Enron Corporation,
and not named as a party in this lawsuit.

The 1998 Partnering Term Sheet was an agreement in which NEPCO
and SSPI agreed to work together and pool their resources in an effort
to win the bid for KPUD's Roosevelt Facility and partner together on

future opportunities and projects.  KPUD's Complaint alleges that in
partnering, S&S and NEPCO "formed an alliance, and/or a joint venture,
and/or an agreement to Act in Concert, and to work as a 'team'
(hereinafter, the 'Alliance') to convince KPUD to rely upon their
combined[1] experience, expertise and abilities and upon the performance
capabilities of the Waukesha Engines in order for the Alliance to
obtain the award of the bid for the LPG [Roosevelt] Project."
Complaint, ¶13.  In forming this Alliance, the Complaint alleges that
S&S was thereafter bound to any agreement NEPCO might make with KPUD
in connection with the Roosevelt Project.  Complaint, ¶39-42.

NEPCO, allegedly acting as an agent, partner, team member etc.
for S&S and the Alliance, submitted a first "joint" proposal on June
16, 1998, which was rejected, and a second proposal on July 29, 1998
for the Roosevelt Project.  Complaint, ¶¶14, 18.  KPUD eventually
awarded the Roosevelt Facility to NEPCO.  Complaint, ¶19.  KPUD's
Board of Commissioners authorized KPUD to contract with NEPCO in
Resolution No. 1274.

In accordance with Resolution No. 1274, KPUD alleges in its
Complaint, that NEPCO acting on behalf of itself and S&S, entered into
an "Agreement Between Owner and Contractor" ("Construction
Contract")with KPUD for the installation of four landfill gas
generators at the Roosevelt Facility.  Complaint,¶20.  However, the
only entity signing the agreement as "contractor" was NEPCO.  The
Construction Agreement became effective September 8, 1998.  Id.  The

_____

[1]Emphasis added by the Court.

ORDER - 5

1  Construction Contract expressly incorporated a number of additional

2  documents by reference.[2]

3       KPUD alleges in its Complaint that from the first day of

4  commercial operation, it experienced numerous engine breakdowns and

5  other problems relating to the performance of the engines and the LFG

6  cleaning and compression system, causing KPUD to incur significant

7  additional costs and engine downtime resulting in significant lost

8  revenues.  Complaint, ¶23.  KPUD states that "from the date the

9  Engines began commercial operations to the date of the first

10 catastrophic failure of a connecting rod in Engine #2 on May 21, 2001,

11 in particular, but continuing to this day, the Engines had an

12 inordinate amount of problems, on a consistent basis . . . ".

13 Complaint, ¶23.

14 **II.  LEGAL STANDARDS FOR SUMMARY JUDGMENT**

15      A Court will grant summary judgment where the documentary

16 evidence produced by the parties permits only one conclusion.

17 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The party

18 seeking summary judgment must show that no genuine issue of material

19 fact exists and that the Court should grant judgment as a matter of

20 law.  *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986).  "A material

21 issue of fact is one that affects the outcome of the litigation and

22 requires a trial to resolve the parties' differing versions of the

23 truth."  *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

24

25 ─────────────────

       [2]These documents included: General Conditions, dated July 17, 1998;
26 Request for Proposals, Roosevelt Landfill Biogas Project I, dated July
   17, 1998, together with Addenda Nos. 1, dated July 23, 1998; Contractor's
27 Payment and Performance Bond; Contractor's Proposal Dated July 29, 1998;
   and Executed Indemnification Agreement.

28

The Court must construe all facts and all justifiable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Marks v. United States*, 578 F.2d 261, 263 (9th Cir. 1978). The non-moving party may use affidavits, depositions, answers to interrogatories, and admissions to do this. *Celotex*, 477 U.S. at 323-24. The court must enter summary judgment against a party who fails to make a showing sufficient to establish an essential element of a claim, even if genuine factual disputes exist regarding other elements of the claim. *Id*. At 322-23. No issue for trial exists unless sufficient evidence favors the non-moving party for a jury to return a verdict for that party. *Anderson*, 477 U.S. at 249. Thus, a scintilla of evidence in support of the non-moving party's position will not suffice. *Id*. at 252.

At the summary judgment stage the Court's function is not to weigh the evidence or judge credibility, but to determine whether there is a genuine issue for trial. *Id*. at 249. Essentially the inquiry is "whether the evidence presents a sufficient disagreement to require submission to [a fact finder] or whether it is so one sided that one party must prevail as a matter of law." *Id*. at 251-52.

**III.  DISCUSSION - CONTRACT CLAIMS**

Not surprisingly, both parties have divergent views of the scope of their bargain. No single document in the record specifically answers the question, therefore the Court must construe the writings as a whole to ascertain the scope of the parties' bargain.

/ / /

**A.    Claim 1 - Breach of Construction Contract**

In connection with KPUD's contract-based claims, KPUD has invited the Court to dismiss with prejudice its first cause of action.  KPUD has also clarified that it does not seek any claims for breach of the Operations & Maintenance Agreement ("O&M Contract") as well.  The Court dismisses with prejudice KPUD's breach of contract claims with respect to the Construction Contract (prime construction contract dated September 8, 1998 between KPUD and NEPCO) and the O&M Agreement (between KPUD and NEPCO's "sister" company Operational Energy Corporation or OEC) also dated September 8, 1998 as KPUD abandons the breach of contract claims in its Complaint.  This is presumably based on the fact that S&S was not a party to these two contracts.

**B.    Claim 2 - Breach of Contract Re: KPUD's Rights As Third Party Beneficiary Of Obligations Owed By Defendants To NEPCO Or To Each Other**

KPUD asserts third party beneficiary rights to all contract obligations Defendants owed to NEPCO and all contract obligations Defendants may owe each other.  KPUD, therefore, argues that it should have rights as a third-party beneficiary of two agreements between NEPCO and Defendant Stewart & Stevenson companies.  The first agreement KPUD seeks third party beneficiary rights to is the June 1998 Partnering Term Sheet and the second agreement is the PO #101 Contract.

KPUD states that it is an intended third-party beneficiary of the guarantees contained in the 1998 Partnering Term Sheet. Ct. Rec. 119, at 5.  KPUD contends that it is undisputed that S&S and NEPCO knew that KPUD was an ultimate purchaser.  KPUD states that S&S communicated with KPUD many times and packaged components to meet S&S'

1  guarantees.  Hanson Decl. at ¶¶4-5. 18, 21; Svendsen Decl. At ¶¶3-5,
2  8, 11-13.  KPUD further states that the S&S-NEPCO-Waukesha project
3  team made technical sales presentations to KPUD.  Ct. Rec. 119, at 7.

4      S&S argues that KPUD has failed to offer evidence that either S&S
5  or NEPCO intended PO #101 to create a direct obligation on the part of
6  S&S to KPUD.  S&S further argues that it has offered uncontroverted
7  evidence that the 1998 Partnering Term Sheet was never intended to
8  confer any direct rights on KPUD.  See Tardanico Decl. at ¶5.
9  Finally, S&S argues that the prevailing rule in Washington is that a
10  property owner is generally not a third-party beneficiary of a
11  contract between the general contractor and a subcontractor.  *Warner*
12  *v. Design & Build Homes, Inc.*, 128 Wn.App.34, 43 (2005).

13     The parties agree that Washington law governs the determination
14  of whether a third-party beneficiary contract exists.  Under
15  Washington law such a contract exists when the contracting parties, at
16  the time they enter into the contract, intend that the promisor will
17  assume a direct obligation to the claimed beneficiary. *Postlewait*
18  *Constr., Inc. v. Great Am. Ins. Cos.*, 106 Wash.2d 96, 99, 720 P.2d 805
19  (1986).  The test of intent is an objective one:  Whether performance
20  under the contract necessarily and directly benefits the third party.
21  *Postlewait Constr., Inc.*, 106 Wash.2d at 99, 720 P.2d 805.  An
22  incidental, indirect, or inconsequential benefit to a third party is
23  insufficient to demonstrate an intent to create a contract directly
24  obligating the promisor to perform a duty to a third party.  *Del Guzzi*
25  *Constr. Co. v. Global Northwest Ltd.*, 105 Wash.2d 878, 886, 719 P.2d
26  120 (1986).

27
28

ORDER - 9

In the construction context, the prevailing rule is that a property owner is generally not a third-party beneficiary of a contract between the general contractor and a subcontractor. The owner is neither a creditor beneficiary nor a donee beneficiary; the benefit that he receives from performance must be regarded as merely incidental. Arthur L. Corbin, CORBIN ON CONTRACTS § 779D (1979); see generally Melvin A. Eisenberg, Third-Party Beneficiaries, 92 Colum. L.Rev. 1358, 1402-1406 (1992).

The Restatement (Second) of Contracts endorses the same rule by way of an illustration: "A contracts to erect a building for C. B then contracts with A to supply lumber needed for the building. C is an incidental beneficiary of B's promise, and B is an incidental beneficiary of C's promise to pay A for the building." Restatement (Second) of Contracts § 302 cmt. e, illus. 19 (1979).

The Court next examines each of the agreements to determine if KPUD would qualify as an intended third-party beneficiary.

**1.   1998 Partnering Term Sheet**

The Natural Gas/Land Fill Gas Fueled Reciprocating Engine Power Projects Partnering Term Sheet ("1998 Partnering Term Sheet") was signed by NEPCO and Defendant Stewart & Stevens Power, Inc. ("SSPI") on June 15, 1998. The 1998 Partnering Term Sheet reads, in pertinent part:

> (5) SSPI agrees to be equally bound to the contractual liabilities of the project including but not limited to: LD's, warranties and indemnities.
>
> (7) SSPI agrees to guarantee output (performance) and availability. Output shall be defined at the continuous rating @ .85 pf, roosevelt land gas fill quality and quantity:
> Guaranteed kw Availability shall be guaranteed at no less than 95%. **The failure of which SSPI will incur**

ORDER - 10

**the resulting liabilities (e.g. L.D.'s/Buydown) as finally negotiated with the client (PUD)**

(8) SSPI will guarantee 5 year life cycle costs (all in) excluding cost of fuel, facility operators and routine maintenance labor (filters, oil changes, spark plugs and valve adjustments) at the following levels:

Option 1 - 4 x840 kw units - $900,157 over 5 years from owner acceptance
Option 2 - 5 x 2100 kw units - $583,482 total over 5 years from owner acceptance.

The Court finds that KPUD more closely resembles a third-party incidental, indirect, or inconsequential beneficiary.  Such a finding is insufficient to demonstrate an intent to create a contract <u>directly</u> obligating the promisor S&S to perform a duty to the third party, KPUD.  In the 1998 Partnering Term Sheet, at Clause 5, the parties agree that S&S will be equally bound [with NEPCO] to the contractual liabilities of the project including but not limited to: LD's, warranties and indemnities.  There is no evidence that S&S agreed to assume greater liability than NEPCO.

In the 1998 Partnering Term Sheet, at Clause 7, the parties agree that SSPI will incur the resulting liabilities (e.g., LD's/Buydown) for any failure of the guaranteed kw availability **as finally negotiated with the client PUD**.  This suggests that at the signing of the 1998 Partnering Term Sheet, SSPI was not yet sure of the specifics of the final negotiations between NEPCO and KPUD with regards to the guarantees.  Without the completion of negotiations, S&S could not assume any direct obligation to KPUD, as a third party beneficiary. What is clear from the 1998 Partnering Term Sheet is that SSPI did agree to be equally bound to the contractual liabilities of the project, including warranties, as NEPCO.

ORDER - 11

The Court finds that KPUD is not a third-party beneficiary solely by reference to the 1998 Partnering Term Sheet, which merely sets forth the partnering relationship SSPI and NEPCO would assume for the KPUD project as well as future projects.  The negotiations were not yet complete between NEPCO and KPUD making it difficult for S&S to assume any direct obligation to KPUD through that agreement standing by itself.

As discussed in the next section, however, the 1998 Partnering Term Sheet is superceded by the PO #101 contract, as the former is expressly incorporated by reference into the PO #101 Contract.  (See Clause 3.0 of the PO #101 Contract).  As discussed below, the Court finds KPUD more closely resembles a third party beneficiary to the PO #101 Contract.

**2.  PO #101 Contract**

The PO #101 Contract, a purchase contract, was signed on December 22, 1998 by S&S and on January 7, 1999 by NEPCO.  The PO #101 Contract expressly incorporates eight individual contracts, and specifically the liability-limiting clauses of KPUD's prime contracts (the Construction Contract and the O&M Agreement).  The contract documents expressly incorporated into the PO #101 contract are as follows:

- The Purchase Order
- The Construction Contract
- The O&M Agreement
- NEPCO Technical Specification for Equipment
- OEC/S&S O&M Term Sheet
- Start Up Responsibilities Matrix
- NEPCO/SSPI Confidentiality Agreement
- 1998 Partnering Term Sheet

The Court finds that the incorporation by reference of KPUD's prime contracts provides evidence that the contracting parties, at the

1  time they entered into the PO #101 contract, intended that S&S (or at

2  least the "S&S-Dresser-NEPCO team" or "Alliance") would assume a

3  direct obligation to the claimed third party beneficiary, KPUD.

4  Performance under the contract, when one considers the incorporated

5  prime contacts, necessarily and directly benefitted the claimed third

6  party KPUD.

7      Generally, all writings which are part of the same transaction

8  are interpreted together.  Restatement (Second) of Contracts § 202(2).

9  So long as the contract makes clear reference to the document and

10 describes it in such terms that its identity may be ascertained beyond

11 doubt, the parties to a contract may incorporate contractual terms by

12 reference to a separate, noncontemporaneous document, including a

13 separate agreement to which they are not parties.  See 11 Williston on

14 Contracts § 30:25 (4th ed.).

15     The United States Court of Appeals, Federal Circuit in *Caguas*

16 *Cent. Federal Sav. Bank v. U.S.*, 215 F.3d 1304, 1308 (Fed Cir. 2000).

17 summarized the relevant law relating to contracts and third party

18 beneficiaries as follow:

19          Ordinarily, only the parties to a contract
            have rights thereunder that they may enforce.
20          *See, e.g., First Hartford Corp. Pension Plan &*
            *Trust v. United States*, 194 F.3d 1279, 1289
21          (Fed.Cir.1999). The parties, however, may
            create rights for the benefit of third
22          persons, which those persons may then
            vindicate and enforce as third party
23          beneficiaries of the contract. *See id.* For
            there to be third party beneficiaries,
24          however, "the contract must 'reflect[ ] the
            express or implied intention of the parties to
25          benefit the third party.'  The intended
            beneficiary need not be specifically or
26          individually identified in the contract, but
            must fall within a class clearly intended to
27          be benefited [sic] thereby." *Montana v. United*
            *States*, 124 F.3d 1269, 1273 (Fed.Cir.1997)

28

ORDER - 13

(quoting *Schuerman v. United States*, 30 Fed.
Cl. 420, 433 (1994)); see also Restatement
(Second) of Contracts § 302(1) (1979).

Interpreting all the writings which are part of the same transaction, the Court finds that KPUD is a third-party beneficiary to the PO #101, which expressly incorporates all of the prime contracts. It is clear that these documents were intended to confer direct rights on KPUD. KPUD's rights, however, would necessarily be subject to the terms and conditions of the KPUD contracts that were incorporated by reference into PO #101 Contract, including the limitations on damages/remedies of the KPUD prime contracts. Furthermore, KPUD has failed to offer any evidence that the S&S agreements (the 1998 Partnering Term Sheet and PO #101 Contract) promised any greater warranty than the prime contracts.

S&S and NEPCO both confirm that S&S' guarantees were to be no greater than those NEPCO and OEC negotiated with KPUD. S&S SMF Nos. 41, 42, 44-45, 48. Interpreting the contracts constituting the PO #101 Contract, the Court finds that under a "No Conflict or Separation between Agreements" clause, Clause 10.1 of the PO #101 Contract, it is clear that NEPCO and S&S intended that there would not be any conflict between the several agreements and that the obligations under the PO #101 Contract and the long-term O&M Agreement were unified and merged.

Incorporation by reference allows the provisions of a contract to be included within the terms of a second contract by referring to the first contract. *Turner v. Wexler*, 14 Wash.App. 143, 538 P.2d 877 (1975). The sub-subcontract incorporates by reference, without qualification, the terms of the prime contract. Where the incorporation clause is general and unlimited, as here, the contract

specifications, procedural provisions, and liability provisions of the
prime contract are incorporated by reference. *Sime Const. Co., Inc.
v. Washington Public Power Supply*, 28 Wn. App. 10, 16, 621 P.2d 1299
(1980); *Turner v. Wexler*, 14 Wn. App. 143, 538 P.2d 877 (1975).  Where
a writing refers to another document, that other document becomes
constructively a part of the writing, and in that respect the two form
a single instrument. *Kenworthy v. Bolin*, 17 Wash. App. 650, 564 P.2d
835 (1977).

When two or more writings are executed at the same time and
involve the same transaction, they should be construed as a whole;
this rule applies equally where several agreements are made as part of
one transaction even though they are executed at different times.
Restatement (Second) of Contracts § 202(2) (1981)(A writing is
interpreted as a whole, and all writings that are part of the same
transaction are interpreted together.).

The primary purpose of judicial interpretation of contracts is to
give effect to the parties' intentions.  To the extent possible, where
parts of the same writing are inconsistent, they should be construed
so as to harmonize with one another. *Grant County Const'rs v. E. V.
Lane Corp.*, 77 Wash.2d 110, 120, 459 P.2d 947 (1969).  Contract terms
and their legal effect are to be determined as a whole. 3A. Corbin,
Contracts s 547, at 183 (1960).

Whether the several agreements constitute one contract, the PO #
101 Contract, or more than one contract, is a question of
interpretation or law for the court and does not create a factual
issue. *American Pipe & Constr. Co. v. Harbor Constr. Co.*, 51 Wash.2d
258, 265, 317 P.2d 521 (1957).  The Court finds, as a matter of law,

that KPUD's third-party beneficiary claim is limited by the

incorporated prime contracts, which provide:

> (i) There can be no claims for lost revenue, lost power,
> cost of capital, plant downtime costs, and costs of
> purchased or replaced power.  See Article 2.05 of KPUD/NEPCO
> Construction Contract (S&S SMF No. 19) and Article 11.4 of
> the O&M Contract.  S&S SMF No. 31).

> (ii) There can be no claims for indirect, consequential, special
> or incidental damages.  See Article 2.05 of KPUD/NEPCO
> Construction Contract (S&S SMF No. 19) and Article 11.1[3] of
> the O&M Contract (S&S SMF No. 32).  NEPCO emphasized this
> limitation in a memo it sent to KPUD before KPUD signed the
> prime contracts.  (S&S SMF No. 49).

> (iii) All claims for failure to maintain 95% availability
> are limited by Appendix A of the O&M Agreement to a
> reduction in whatever Annual Operating Fee KPUD might owe
> OEC during the term of the O&M Contract. (S&S SMF No. 28).

> (iv) KPUD's termination for convenience of the O&M Contract
> in its third year (S&S SMF No. 33) effectively capped its
> claim for breach of guarantees.  After it unilaterally
> terminated the multi-year maintenance contract, KPUD could
> no longer hold OEC or S&S to guarantees therein while a new
> contractor took over maintenance.

> (v) All claims for breached guarantees in the O&M Contract
> (95% availability, limited O&M cost, maximum emissions over
> a 5-year period) are capped at 25% of the Annual Operating
> Fees actually owed to OEC during its contract term.  (S&S
> SMF No. 29).

---

[3]The O&M Agreement, at clause 11.1, clearly and expressly limits

liability as to the parties KPUD and OEC, **and any of their respective**

**agents, subcontractors, vendors or employees**.  This is written evidence

that KPUD intended that subcontractors, like S&S, should be limited

liability-wise.  KPUD attempts to convince the Court that S&S was not a

"subcontractor."  Ct. Rec. 136, at 20.  This argument is inconsistent

with the written documents referenced above as well as the historical

relationship between the parties.

ORDER - 16

The Court finds, when construing the several agreements as a whole, the limitations apply to the subcontractor S&S, who was part of the "Alliance" that KPUD negotiated[4] with for engine performance guarantees.  The Court also rejects KPUD's argument that equitable estoppel prevents S&S from relying on the Construction Contract and the O&M Agreement to limit KPUD's remedies.  (Ct. Rec. 119, at 25).

"Equitable estoppel is not favored, and the party asserting estoppel must prove each of its elements by clear, cogent, and convincing evidence." *Robinson v. City of Seattle*, 119 Wash.2d 34, 82, 830 P.2d 318 (1992).  Under this burden of proof, the trier of fact must be convinced the fact in issue is "highly probable". *Colonial Imports*, 121 Wash.2d at 735, 853 P.2d 913; *In re Sego*, 82 Wash.2d 736, 739, 513 P.2d 831 (1973).

The elements to be proved are: (1) an admission, statement, or act inconsistent with a claim afterward asserted; (2) action by another in reasonable reliance on that act, statement, or admission; and (3) injury to the party who relied if the court allows the first party to contradict or repudiate the prior act, statement, or admission. *Id*.

---

[4]Brian Skeahan, a past general manager of KPUD stated in his Declaration dated June 30, 2994: "The engine performance guarantees that were specifically requested by KPUD in its request for proposal were a core element for the proposals.  The guarantees proposed by NEPCO and defendants Dresser and Stewart and Stevenson were specifically set forth in the proposal they jointly submitted and they were negotiated and accepted by KPUD."  Ct. Rec. 33, at 2.

ORDER - 17

1    The Court does not find it "highly probable" that S&S agreed to

2    assume greater liability than NEPCO.   The evidence from KPUD's own

3    Complaint is that KPUD relied on the S&S-NEPCO-Waukesha project team

4    during negotiations and not S&S's own representations on the side

5    regarding warranties and guarantees.   The Court notes too that KPUD

6    has abandoned its misrepresentation claim against S&S eliminating any

7    inconsistent statements or acts, or misrepresentations for the Court

8    to consider.

9    **C.   Claim 4 - Breach of Express UCC Warranties**

10    KPUD argues that its claims against S&S are now largely based on

11    oral UCC express warranties.   KPUD alleges that S&S made express

12    warranties with regard to plant availability, air emissions, and costs

13    of O&M services to be provided under the O&M contract.

14    KPUD argues that the express oral warranties S&S allegedly made are

15    independent from KPUD's written contracts on the landfill gas project.

16    Finally, KPUD states that S&S cannot disclaim its express warranties.

17    S&S argues that under applicable law, any express warranties

18    alleged to have been made in this matter must be construed as part of

19    the overall written contracts by which KPUD acquired the landfill gas

20    project.   S&S points out that RCW 62A.20-313 similarly provides that a

21    U.C.C. express warranty by definition becomes part of the basis of the

22    bargain and that they are added to the other terms under which the

23    buyer purchases goods.   S&S states that KPUD has offered no legal

24    authority for its position that each express warranty should be

25    construed as totally unaffected by any other written remedy-limiting

26    provisions for which the buyer bargained.

27

28

ORDER - 18

Wash. Rev.Code Ann. sec. 62A.20-313 (West 2003) provides, 'Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.'

Assuming S&S offered the alleged oral express warranties to KPUD, the Court finds that such warranties were offered in connection with the overall "bargain" under which KPUD purchased goods and services from NEPCO and OEC.

It is relevant that KPUD did not skimp on the written expressions of its Roosevelt Facility agreements.  The effect of a written contract on an oral agreement must be taken into consideration. In *Randall v. Tradewell Stores*, 21 Wash.2d 742, 153 P.2d 286 (1944), the Washington Supreme Court wrote:

> It is well settled that the execution of a contract in writing supersedes and merges all the oral negotiations or stipulations concerning its terms and the subject matter which preceded or accompanied the execution of the instrument, in *759 the absence of accident, fraud, or mistake of facts; and in action on the contract any representation made prior to or contemporaneous with the execution of the written contract is generally inadmissible to contradict, change or add to the terms plainly incorporated in and made a part of the written contract.

*Id*. at 758-59.

There is probably no more frequent application of the parol evidence rule than in cases where one party asserts the existence of an oral warranty when there is a written contract, usually of sale or to sell goods.  See 11 Williston on Contracts § 33:30 (4th ed.). Under the Uniform Commercial Code, as was the case under prior law, if the writing contains a merger clause or a disclaimer stating in terms

1  that there is no warranty or none except what is contained in the

2  writing, it is clear that the parol warranty is ineffectual because it

3  is contradictory and not merely in addition to the writing.  Id.

4       Where the writing on its face does not appear to be a complete

5  statement of the contract or the purchase, or is a mere receipt,

6  memorandum or order, as distinguished from a written contract, or is a

7  promissory note which states that the note is given for the purchase

8  of property on credit, the reason for applying the parol evidence rule

9  is lacking and extrinsic evidence of a warranty is generally admitted.

10 Id.; *Butcher v. Garrett-Enumclaw*, 20 Wash. App. 361, 581 P.2d 1352, 24

11 U.C.C. Rep. Serv. 832 (Div. 1 1978); *see also Berg v. Hudesman*, 115

12 Wash.2d 657, 801 P.2d 222 (1990) (when contract is only partially

13 integrated, meaning a final expression of those terms which it

14 contains but not a complete expression of all terms agreed upon, terms

15 not included in writing may be proved by extrinsic evidence provided

16 that additional terms are not inconsistent with written terms).  This

17 is not the case here-the writings appear to be a complete expression

18 of all terms agreed upon by all parties involved in the Roosevelt

19 Project.  KPUD offers evidence that adds terms that are inconsistent

20 with the written terms.

21      A majority of courts have held that proof of an oral warranty is

22 barred by the parol evidence rule where the contract contained a

23 written disclaimer of warranties conforming to the requirements of the

24 Uniform Commercial Code, especially when there is a merger clause.

25 See 11 Williston on Contracts § 33:30 (4th ed.).  The disclaimer

26 clause alone will suffice to bar parol evidence if it purports to

27 disclaim not only implied but express warranties, since an oral

28

express warranty would be directly contradictory to such a clause. *Id., O'Neill v. U.S.*, 50 F.3d 677, 26 U.C.C. Rep. Serv. 2d 1 (9th Cir. 1995).

The Court is aware, as KPUD argues, that disclaimer of express warranties is disfavored.  However, the only reasonable conclusion to be drawn from an examination of the written contracts is that they were a complete and final expression of the agreement of the parties. Because there is a writing intended by the parties as a final expression of their agreement, the parol evidence rule precludes the introduction of inconsistent terms under these facts.  RCW 62A.20-316(1) suggests that evidence of "contemporaneous oral agreements" which are inconsistent with the terms of a written contract is barred. In this case, KPUD's proof of express oral warranties in the face of a <u>detailed</u> written agreement is subject to the parol evidence rule.

Washington law provides us with guidance on disclaimers of warranties.  UCC 62A.2-316(1)[5] states:

---

[5]Official Comment 1 to this provision sheds light on its purpose: This section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude "all warranties, express or implied."  It seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise.  Official Comment 1, RCWA 62A.2-316. *Olmsted v. Mulder*, 72 Wash.App. 169, 177-78, 863 P.2d 1355 (1993).  Given the sophistication of the parties and extensive

ORDER - 21

> 62A.2-316. Exclusion or modification of warranties
> (1) Words or conduct relevant to the creation of an
> express warranty and words or conduct tending to
> negate or limit warranty shall be construed wherever
> reasonable as consistent with each other; but subject
> to the provisions of this Article on parol or
> extrinsic evidence (RCW 62A.2-202) negation or
> limitation is inoperative to the extent that such
> construction is unreasonable.

The Court finds as a matter of law that it is not unreasonable to construe representations of S&S's agent(s) prior to the sale as being consistent and cumulative with the final written contract.  What KPUD argues are oral express warranties offered prior to entering the prime contracts appear to be essentially the performance guarantees made by the contractor NEPCO and OEC (backed up by S&S) under written contracts.  These alleged oral express warranties do not inherently conflict with the clauses limiting damages and remedies under the prime contracts and should be read together with those limitations.  And while it is true that attempts to disclaim express warranties in Washington are disfavored, *Cox v. Lewiston Grain Growers, Inc*. 86 Wn.App. 357, 365 (1997)[6], a prudent and sophisticated party would reduce to writing which warranties were made, disclaimed or relied upon as a prerequisite of entering the written contract which had specific and detailed liability limitations.  *See Betaco, Inc. v. Cessna Aircraft Co*., 103 F.3d 1281, 31 U.C.C. Rep. Serv. 2d 1 (7th

_____

negotiations which occurred, KPUD is not the sort of buyer this provision was meant to protect.

[6]Washington disfavors disclaimers and finds them to be ineffectual unless they are explicitly negotiated and set forth with particularity. *Berg v. Stromme*, 79 Wash.2d 184, 196, 484 P.2d 380 (1971) (Berg rule).

ORDER - 22

Cir. 1996)(Seventh Circuit found purchase agreement for jet was fully
integrated and could not be contradicted by parol evidence of
purported warranty that jet had "more range" than previous model,
consistent with vague precontractual representations, where purchase
agreement contained straightforward integration clause, agreement
incorporated written specifications as to jet's expected performance,
including range, and expressly disclaimed any other warranties, and
agreement was presented to sophisticated purchaser, who read and
understood terms and who signed contract at moment of his own
choosing, after making modifications).  KPUD was such a prudent and
sophisticated party.

The Court finds that the evidence KPUD offers in support of the
existence of express warranties lacks specificity and arguably
includes statements that could be construed as non-actionable puffing.
Even assuming that the representations made by S&S's agents to KPUD
before the sale constituted express oral warranties, those
representations prior to formation of the written contract, were
thereafter limited or disclaimed by the P0 #101 written contract,
incorporating by reference other contracts expressly limiting oral and
implied warranties and guarantees.[7]  The Court finds that KPUD should
not be entitled to escape the limitations by seeking to introduce
parol evidence of pre-contract oral express warranties in this case.
The Court dismisses plaintiff's count for breach of express
warranties.

**UCC Statute of Frauds**

[7]See Clause 11.1 and 11.4 of the O&M Agreement.

ORDER - 23

1    S&S alternatively argues that if the express warranty claims
2    survive this motion, the breach of such express warranties must be
3    dismissed under the Washington UCC statute of frauds, RCW 62A.2-
4    201(1).  This statute requires a writing for an enforceable contract
5    for the sale of goods priced at $500 or more.  The Court disagrees
6    with S&S's reasoning.

7        To be enforceable, contractual relationships under the UCC must
8    be formed according the code's safeguards, making contractual
9    relationships comparatively formalized.  See, e.g., RCW 62A.2- 201
10   (statute of frauds).  In contrast, express representations, made in
11   advertisements or otherwise, require no formalities.  To recover for
12   breach of express warranty, a plaintiff must show that the
13   representation was not "merely the seller's opinion or
14   commendation of the goods."  RCW 62A.2-313(2).  When compared to the
15   determination of whether a contract exists under article 2 of the UCC,
16   the determination of whether an express warranty was made is
17   relatively inexact, depending upon numerous factors.  See, e.g., *Fed.*
18   *Signal Corp. v. Safety Factors, Inc.*, 125 Wash.2d 413, 424-25, 886
19   P.2d 172 (1994) (considering several factors).   The Court finds that
20   the statute of frauds would not bar a claim for breach of express
21   warranties.

22   **UCC Statute of Limitations**

23       S&S alternatively argues that if the Court finds the claims for
24   breached express warranties are not barred by the UCC statute of
25   frauds, they are "surely barred by the applicable statute of
26   limitations." Ct. Rec. 144, at 44.  S&S argues that the applicable
27   statute of limitations for oral express warranties is three (3) years,
28

1  citing *Daughtry v. Jet Aeration Co.*, 91 Wn.2d 704, 708 n.1, 592 P.2d
2  631 (1979).

3      S&S is correct.  Pursuant to RCW 4.16.080(3), the applicable
4  statute of limitations for a claim involving an oral express warranty
5  breach is three (3) years.  RCW 62A.2-725 addresses the issue of when
6  a cause of action accrues.  This statute provides:

7      **62A.2-725** Statute of limitations in contracts for sale

8          (2) A cause of action accrues when the breach occurs,
           regardless of the aggrieved party's lack of knowledge
9          of the breach. A breach of warranty occurs when tender
           of delivery is made, except that where a warranty
10         explicitly extends to future performance of the goods
           and discovery of the breach must await the time of
11         such performance the cause of action accrues when the
           breach is or should have been discovered.

12

13     S&S argues that four of five Waukesha engines and all of the C&C
14  gas cleaning equipment were delivered no later than May 12, 1999. See
15  S&S-SMF No. 50-56.  S&S states that the undisputed facts further
16  indicate that the fifth Waukesha engine was accepted no later than
17  July 2000.  KPUD, on the other hand, argues that it did not know that
18  the engines were "unsuitable" until May 21, 2001.

19     S&S sets forth competent evidence that KPUD had knowledge well
20  before December 11, 2000, and in any event, much earlier than May 21,
21  2001, that the engines had problems, existence of siloxane buildup,
22  plant availability that was below 95% and high O&M costs.  Ct. Rec.
23  144, at 45.  S&S concludes that the only problems KPUD did not know of
24  more than 3 years prior to filing the lawsuit[8] were the crankshaft and
25  connecting rod replacement problems, arising in 2001.

26

27  ────────────────

28      [8]The Complaint was filed on December 11, 2003.

ORDER - 25

1    KPUD argues that the statute of limitations should be extended

2    under RCW 62A.2-725(2) because "S&S warranties explicitly extended to

3    future performance."  Ct. Rec. 136, at 33.  But this argument flies in

4    the face of KPUD's own Complaint[9] and its theory under which it

5    attempts to avoid the effect of disclaimer clauses in the O&M

6    Contract.  At page 9 of KPUD's Supplemental Brief, KPUD explains:

7        . . . KPUD does not claim that S&S, as a subcontractor
         to Operational Energy Corporation, negligently
8        operated or maintained the engines and the cleaning
         and compression system.  KPUD instead claims that the
9        equipment was fundamentally unsuitable and incapable
         of performing as S&S promised.  The fault was with the
10       goods that KPUD purchased under the Construction
         Contract, not the services that S&S performed under
11       the O&M agreement . . .

12   Ct. Rec. 139, at 9.

13       The Court notes that according to KPUD's argument, the

14   catastrophic events (violent engine failures) occurred in August 2001

15   for Engine 1; in May 2001 for Engine 2; and in December 2001 for

16   Engine 5.  Based on KPUD's own claim, however, "that S&S and Waukesha

17   supplied KPUD with fundamentally unsuitable equipment that no amount

18   of competent operation or maintenance could correct", the Court finds

19   the cause of action for KPUD's claim for breach of oral express

20   warranty accrued when the breach allegedly occurred, regardless of

21   KPUD's alleged lack of knowledge of the breach.

22       The Court finds the breach of warranty occurred when the engines

23   were delivered.  It appears undisputed that four of five Waukesha

24   engines and all of the C&C gas cleaning equipment were delivered no

25   later than May 12, 1999.  The fifth and final engine was purportedly

26   ─────────────────

27       [9]KPUD's Complaint alleges that the engines failed "from the first

28   date of commercial operation [June 1, 1999]."

delivered on or before July 2000.  As for any breach of oral
warranties for the first four engines, KPUD was required to file its
lawsuit before May 2002, and by July 2003 for the fourth engine.  If,
for the sake of argument only, the Court were not to dismiss KPUD's
express warranty claim, the applicable statute of limitations would
effectively overcome all but the crankshaft and connecting rod
replacement problems, arising in 2001, and known to KPUD less than
three years before filing this suit.  The Court has dismissed KPUD's
breach of express warranty claim making this discussion merely
academic.

**D.   Claim 6 and 7 - Breach of UCC Implied Warranties**

     KPUD appears to argue that UCC implied warranties arose out of
alleged direct representations by S&S to KPUD prior to the formation
of the written contracts.  The implied warranties are: fitness for a
particular purpose and merchantability.

     S&S argues that the Washington Supreme Court rejected claims for
implied warranty against a nonprivity manufacturer in *Baughn v. Honda
Motor Co., Ltd.*, 107 Wn.2d 127, 150, 727 P.2d 655, 668-69 (1986).  S&S
also argues that the *Touchet Valley*[10] decision did not overturn the
*Baughn* decision and merely "carved a third-party beneficiary exception
out of the general rule that a vertical nonprivity plaintiff cannot
recover from a remote manufacturer for breach of implied warranty."
149 Wn.2d at 210, 66 P.3d at 628.

     The plain language of both RCW 62A.2-314 and 62A.2-315 requires
that implied warranties only arise out of contractual relationships.

---

[10]*Touchet Valley Grain Growers, Inc. V. Opp & Siebold Gen. Constr.,
Inc.*, 119 Wn.2d 334 (1992).

ORDER - 27

RCW 62A.2- 314 states that the warranty that goods shall be merchantable is "implied in a contract for their sale." *Tex Enterprises, Inc. v. Brockway Standard, Inc*., 149 Wash.2d 204, 211, 66 P.3d 625 (2003). Similarly, RCW 62A.2-315 explains that the implied warranty of fitness for a particular purpose arises based on the seller's understanding "at the time of contracting." This language can be contrasted with RCW 62A.2-313 (express warranties), the language of which does not refer to an underlying "contract." Thus, the plain meaning of this statutory language forecloses application of implied warranties where there is no underlying contract to which the purchaser is a party or an intended third-party beneficiary.

There is no underlying contract between S&S and KPUD but as the Court mentioned above, there is adequate evidence to find that KPUD was a third-party beneficiary to the PO #101 Contract between S&S and NEPCO. At the hearing, however, it appeared that KPUD based its breach of Washington UCC implied warranty claims solely out of the alleged direct oral representations by S&S. Tr. at 84:18-23. The Court must consider, despite KPUD's position at the hearing, the law allowing application of implied warranties where the purchaser is an intended third-party beneficiary as the Court found KPUD was relative to the PO #101 Contract above.

Under Washington law, UCC implied warranties can validly be disclaimed under RCW 62A.2-316. This statute provides:

> (2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There

> are no warranties which extend beyond the description
> on the face hereof."

The Court finds that KPUD's rights as an intended third party beneficiary of the PO #101 Contract are subject to the waivers of implied warranties that flowed down into the PO #101 Contract through its incorporation of the prime contracts. The exclusion of implied warranties by waiver and disclaimer are in writing and conspicuous, appearing in uppercase lettering. See Clause 11.4 of the O&M Agreement. KPUD's claims of UCC implied warranties must be dismissed.

**IV. DISCUSSION** - **NON-CONTRACT CLAIMS**

For the non-contractual counts, the parties agree that Washington law governs.

**A.   Claim 3 - Promissory Estoppel**

KPUD has stipulated to dismissal of Claim 3 with prejudice, which the Court accepts.

**B.   Claim 8 - Misrepresentation**

KPUD has stipulated to dismissal of Claim 8 with prejudice, which the Court also accepts.

**C.   Claim 4 - Washington Products Liability Act (WPLA)**

KPUD invokes the WPLA to recover economic loss damages that arose from alleged breaches of performance guarantees, as well as property damage caused by the failure of two engine rods and a crankshaft in 2001.

S&S argues that the vast majority of KPUD's damages, itemized in KPUD's January 31, 2005 damage summary (Ct. Rec. 106, Exh. B), are pure economic losses unrelated to any "risk of harm" and barred by the WPLA. S&S requests that the Court enter a ruling expressly limiting Claim 4 to property damage or personal injury damages resulting from

the "catastrophic" failure of two rods and a crankshaft in 2001.  S&S argues that KPUD should not be able to use the WPLA to "bootstrap" other economic damages (e.g., consequential damages) into the lawsuit. Ct. Rec. 145, at 3.

Conceptually, KPUD's WPLA damages can be divided into two (2) categories: (1) economic loss caused by alleged breaches of engine performance guarantees (availability, siloxane build-up, emissions, O&M costs); and (2) property damages caused by the "catastrophic" failure of rods in Engines 1 and 2 and crankshaft in Engine 5.

At the hearing, the parties appeared to be in agreement that KPUD may only pursue property damage or personal injury damages under the WPLA and not economic damages resulting from alleged "breaches of performance guarantees."[11]  In any event, S&S points out that KPUD cites no legal authority to support recovering consequential damages (e.g., loss revenues) under the WPLA or extending the WPLA to economic loss damages not connected with the connecting rod and crankshaft issues.

S&S states that KPUD's claims arising from problems other than connecting rods and crankshaft (e.g., plant availability below 95%, air emissions, failure to reduce siloxanes, and high O&M costs) do not involve "risk of harm" and were known to KPUD more than three years prior to filing this lawsuit.  S&S concludes, citing RCW 7.72.060(3), such breach of performance guarantee claims would be barred by the

---

[11]S&S represented at the hearing that the breach of performance guarantees account for approximately $12.5 million of KPUD's $15 million claim. Tr. at 144:7-15.  KPUD represented that its WPLA claim amounts to $2.4 million worth of damages.  Tr. at 116:12-19.

WPLA three-year statute of limitations.  S&S requests an order limiting KPUD's Claim 4 to the property damages arising out of the catastrophic failures of rods and a crankshaft in 2001.

KPUD asserts that the statute of limitations does not apply to bar its claim because it did not know the engines were "fatally" flawed until each exploded.  KPUD states it filed suit within three years after the first engine exploded.  Any suggestion that it knew or should have known about the causal relationship between the defect and the harm it suffered sooner than the first explosion creates a genuine issue of material fact, according to KPUD.

The court in *Staton Hills Winery Co., Ltd. v. Collons*, 96 Wash.App. 590, 593-94, 980 P.2d 784 (1999), in detail, what claims may be brought under the WPLA:

> A party may sue under WPLA for:
> any claim or action brought for harm caused by the
> manufacture, production, making, construction,
> fabrication, design, formula, preparation, assembly,
> installation, testing, warnings, instructions,
> marketing, packaging, storage or labeling of the
> relevant product. It includes, but is not limited to,
> any claim or action previously based on: Strict
> liability in tort; negligence; breach of express or
> implied warranty; breach of, or failure to, discharge
> a duty to warn or instruct, whether negligent or
> innocent; misrepresentation, concealment, or
> nondisclosure, whether negligent or innocent; or other
> claim or action previously based on any other
> substantive legal theory except fraud, intentionally
> caused harm or a claim or action under the consumer
> protection act, chapter 19.86 RCW. RCW 7.72.010(4)
> Essentially, "harm" includes "any damages recognized
> by the courts of this state" except "direct or
> consequential economic loss under Title 62A RCW." RCW
> 7.72.010(6). Neither WPLA, nor RCW 62A, nor case law
> defines the phrase "direct or consequential economic
> loss."

*Id.* at 593-94.

The *Staton Hills Winery* court explored the legislative intent behind adopting the economic loss exclusion:

> There is substantial agreement as to the
> legislative intent in adopting the economic
> loss exclusion. **A major purpose of the
> exclusion is to preserve the distinction
> between contract law, with its focus on
> enforcing expectations created by agreement,
> and tort law, which focuses on protecting
> people and property by imposing a duty of
> reasonable care on others.** *Berschauer/Phillips
> Constr. v. Seattle Sch. Dist. No. 1*, 124
> Wash.2d 816, 821, 881 P.2d 986 (1994), *review
> denied*, 135 Wash.2d 1010, 960 P.2d 937 (1998);
> *Washington Water Power Co. v. Graybar Elec.
> Co.*, 112 Wash.2d 847, 861 n. 10, 774 P.2d
> 1199, 779 P.2d 697 (1989). [Emphasis added.]

*Id.* at 594-95.

The Court finds that it would violate contract law to allow the purchaser to recover more in tort litigation than it could obtain in the contract bargaining process.  See *Berschauer/Phillips*, 124 Wash.2d at 827, 881 P.2d 986.  Therefore, the Court limits KPUD's damages to personal injury (if they exist) and property damages.  The Court further finds that for purposes of Claim 4 only, the statute of limitations does not bar KPUD's claims as it was the "catastrophic" nature of the engine failures (as compared to KPUD's claim that the equipment was fundamentally unsuitable) that created an unreasonable risk of harm to persons or property that the WPLA contemplates redress for. KPUD's Claim 4 survives to the extent that KPUD suffered property and personal injury damages from the engine explosions, the first which occurred on May 2, 2001 through the last engine explosion.

**D.    Claim 9 - Washington Consumer Protection Act (CPA)**

S&S argues that KPUD has failed to allege facts sufficient to establish the five elements required under the CPA, which is fatal to its claim.  KPUD, on the other hand, argues that the elements are met and that S&S is capable of repeating similar statements in the future

which buyers, like KPUD, will rely upon in making purchasing decisions.

To prevail in a private CPA action and therefore be entitled to attorney fees, a plaintiff must establish five distinct elements: (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title*, 105 Wash.2d 778, 719 P.2d 531(1986). Washington unequivocally requires a showing by all private plaintiffs of public interest impact.

Where the transaction is essentially a private dispute, as here, it may be more difficult to show that the public has an interest in the subject matter. Ordinarily, a breach of a private contract affecting no one but the parties to the contract is not an act or practice affecting the public interest. *McRae v. Bolstad*, 101 Wash.2d 161, 676 P.2d 496 (1984) (realtor-property purchaser); *Bowers v. Transamerica Title Ins. Co.*, 100 Wash.2d 581, 675 P.2d 193 (1983) (escrow closing agent-client). However, the third CPA requirement, impact on the public interest, may be established by a showing that (1) the defendant by unfair or deceptive acts or practices in the conduct of trade or commerce has induced the plaintiff to act or refrain from acting; (2) the plaintiff suffers damage brought about by such action or failure to act; and (3) the defendant's deceptive acts or practices have the potential for repetition. *Anhold v. Daniels*, 94 Wash.2d 40, 46, 614 P.2d 184 (1980).

Although KPUD argues the *Anhold* elements, the Court finds KPUD has failed to set forth evidence that S&S' practices have the potential for repetition. KPUD has failed to show any pattern for

deceptive acts or practices and has, in fact, abandoned its claim that
S&S misrepresented or acted deceptively.  The Court finds that the
first and third elements of the *Hangman* test are not met, and fatal to
KPUD's CPA claim.  The Court need not analyze the other elements as
all elements must be met for a successful CPA claim.  Accordingly, the
CPA claim, Claim 9, is dismissed.

**IT IS ORDERED** that:

1.    Defendants' Motion for Partial Summary Judgment Re:
Contract-Based Claims, **Ct. Rec. 99**, filed July 13, 2005 is **GRANTED in
part and DENIED in part**.

Defendants' motion is granted or denied in the following
respects:

a.  Dismissal of Claim 1, Breach of Construction Contract
and Breach of the O&M Agreement, is **GRANTED**.  Claim 1 is dismissed
with prejudice.

b.  Dismissal of Claim 2, Breach of Contract as Third
Party Beneficiary under the 1998 Partnering Term Sheet is **GRANTED.**
Dismissal of Claim 2, Breach of Contract as Third Party Beneficiary
under the PO #101 Contract is **DENIED**.  KPUD's claims for monetary
damages against S&S under the PO #101 Contract are limited to
contractually agreed upon limitations and/or exclusions applicable to
NEPCO and OEC.  In other words, KPUD's third party beneficiary claim
is limited by the prime contracts (Construction Contract and the O&M
Agreement) which provide:

- There can be no claims for lost revenue, lost power, cost of
  capital, plant downtime costs, and costs of purchased or
  replacement power (Article 2.05 of the Construction Contract;
  Article 11.4 of O&M Agreement)

ORDER - 34

- There can be no claims for indirect, consequential, special or incidental damages (Article 2.05 of the Construction Contract; Article 11.1 of O&M Agreement)

- All claims for failure to maintain 95% availability are limited by Appendix A of the O&M Agreement to a reduction in whatever Annual Operating Fee KPUD might owe OEC during the term of the O&M Contract

- KPUD's termination on February 8, 2001 for convenience of the O&M Contract in its third year effectively capped its claim for breach of guarantees.  After it unilaterally terminated the multi-year maintenance contract, KPUD could no longer hold OEC or S&S to guarantees therein while a new contractor took over maintenance

- All claims for breached guarantees in the O&M Contract (95% availability, limited O&M cost, maximum emissions over a 5-year period) are capped at 25% of the Annual Operating Fees actually owed to OEC during its contract term

          c.  Dismissal of Claim 4, Breach of Express UCC Warranties, is **GRANTED**.  Claim 4 is dismissed with prejudice.

          d.  Dismissal of Claims 6 and 7, Breach of UCC Implied Warranties, is **GRANTED**.  These claims are dismissed with prejudice.

     2.     Defendants' Motion for Partial Summary Judgment Re: Non-Contract Claims, **Ct. Rec. 102**, also filed July 13, 2005, is **GRANTED in part, and DENIED in part**.

     Defendants' motion is granted or denied in the following respects:

          a.  Dismissal of Claim 3, Promissory Estoppel, is **GRANTED**.  Claim 3 is dismissed with prejudice.

          b.  Dismissal of Claim 4, Washington Products Liability Act claim, is **DENIED**.  This claim is limited to property damage or personal injury damages (if any) resulting from the "catastrophic" failure of engines occurring on or after December 11, 2000.

          c.  Dismissal of Claim 8, Misrepresentation, is **GRANTED**.  Claim 8 is dismissed with prejudice.

ORDER - 35

d.   Dismissal of Claim 9, Washington Consumer Protection Act claim, is **GRANTED.**   Claim 9 is dismissed with prejudice.

**IT IS SO ORDERED.**

The District Court Executive is directed to file this Order and provide copies to counsel.

**DATED** this 7th day of April, 2006.

                                    S/Lonny R. Suko
_____

                                    LONNY R. SUKO
                          UNITED STATES DISTRICT JUDGE

ORDER - 36